**BIGG WOLF DISCOUNT VIDEO MOVIE SALES, INC.,**

v.

**MONTGOMERY COUNTY, MARYLAND.**

No. CIV.A. DKC 2001–3386.

United States District Court, D. Maryland.

Feb. 6, 2002.

Jonathan Lawrence Katz, Marks and Katz LLC, Silver Spring, MD, for plaintiff.

Clifford L. Royalty, Office of the Montgomery County Attorney, Rockville, MD, for defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this case raising a constitutional challenge to a Montgomery County zoning ordinance restricting "adult entertainment businesses" is the motion of Plaintiff Bigg Wolf Discount Video Movie Sales, Inc. ("Bigg Wolf") for a Preliminary Injunction preventing enforcement of the ordinance pending outcome of the case.[1] The issues are fully briefed and a hearing was held. For reasons that follow, the court will deny the requested injunctive relief.

### I. Background

Unless otherwise noted, the following facts are undisputed. Plaintiff Bigg Wolf is the owner and operator of a retail store at 9421 Georgia Avenue, Silver Spring, Md. The store's primary merchandise is comprised of prerecorded videocassettes and DVDs for purchase and rental. A majority of these are sexually explicit. The store also sells sexually-oriented merchandise such as condoms, sex toys and sexual lubricants. Paper no. 5, Ex. 1.

Bigg Wolf limits the availability of sexually explicit merchandise in its store to consenting adults aged 21 or older. Such merchandise is confined to a separate rear area of the store that is set apart from the rest of the store and which is not visible from the rest of the store or the street. The rear area comprises over 50% of the store's space that is open to customers, though Plaintiff's owner states that sexually explicit merchandise comprises approximately 85–90% of the store's sales. Testimony of Richard Biggs, Preliminary Injunction Hearing, January 29, 2002; Paper no. 5, Ex. 1, at ¶ 6. There are no booths for viewing tapes or DVDs at the store. Paper no. 5, Ex. 1.

Around May 2000, the County enacted zoning provisions directed towards "adult entertainment businesses". Montg. County Zoning Code §§ 59–A–2.1, 59–A–6.16. Prior to the enactment of these provisions, Bigg Wolf had been lawfully located at its present address since 1998.[2] The

---

1. Along with its response to Bigg Wolf's motion, the County filed a motion to dismiss or, in the alternative, for summary judgment. That motion will be denied. Bigg Wolf has stated a claim and, while the County's position is strong on the facts, there remain disputes of fact that militate against granting summary judgment on the current record, prior to the completion of discovery. A scheduling order will be entered governing

discovery and the filing of further dispositive motions.

2. In his affidavit, Bigg Wolf owner Richard Biggs stated that the store had been in its present location since 1993. Paper no. 5, Ex. 1. However, during his testimony at the January 29, 2002, Preliminary Injunction hearing, Biggs corrected his statement to note that Bigg Wolf has been in business since 1993, but in its present location only since 1998.

amendments to the Ordinance became effective on May 1, 2000. Paper no. 8, Ex. 1.

Under the zoning provisions, all "adult entertainment businesses" in Montgomery County must be located in the county's C–2, I–1 or I–2 zoning districts. Montg. County Zoning Code §§ 59–c–4.2(d), 59–C–5.21(d).

The zoning provisions, § 59–A–2.1, define "adult entertainment business" as follows:

> An establishment that: (1) sells, rents, exhibits, or displays adult entertainment materials using a floor area that is more than 10 percent of the total floor area for selling, renting, exhibiting, or displaying all materials; (2) features nude persons or adult entertainment performances; or (3) otherwise requires a County license as an adult entertainment business.

The same section defines "adult entertainment material" as:

> Material that is a book, magazine, periodical, or other printed matter; photograph, film, motion picture, video cassette, slide or other visual representation; sculpture or 3–dimensional representation; or sexual paraphernalia that depicts or describes, or a live performance that depicts, sadomasochistic abuse, sexual conduct, or sexual excitement as defined in State law (Section 416A or Article 27 of the Annotated Code of Maryland).

The referenced provisions of Md. Ann. Code art. 27, § 416A define the foregoing terms as follows, in pertinent part:

> (c) "Sadomasochistic abuse" means flagellation or torture by or upon a human who is nude or clad in undergarments, or in a revealing or bizarre costume, or the condition of one who is nude or so clothed as being fettered, bound, or otherwise physically restrained;
>
> (d) "Sexual conduct" means human masturbation, sexual intercourse, or any touching of or contact with genitals, pubic areas, or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex, or between human and animals;
>
> (e) "Sexual excitement" means the condition of human male or female genitals, or the breasts of the female when in a state of sexual stimulation, or the sensual experience of humans engaging in or witnessing sexual conduct or nudity.

The zoning provisions, § 59–A–6.16, place the following restrictions on the location and practices of adult entertainment businesses, in pertinent part:

> (a) An adult entertainment business is permitted in certain zones, subject to the following restrictions and regulations:
>
> (1) The adult entertainment materials must not be visible from outside the establishment...
>
> (3) The adult entertainment business must be located at least 750 feet from any property: (A) located in a residential zone, or (B) on which a school, library, park, playground, recreational facility, day care center, place of worship, or other adult business is located as a principal use. The distance must be measured in a straight line from the nearest property line of the property used for the adult entertainment business to the nearest boundary line of any property located in a residential zone, or on which a school, library, park, playground, recreational facility, day care center, place of worship or other adult entertainment business is located...
>
> (5) An adult entertainment business may operate only between the hours of 9:00 a.m. and 11:00 p.m.

The zoning provisions allow existing non-conforming adult entertainment businesses to continue to operate for eighteen

months following the effective date of the amendment. At the expiration of this amortization period, in October 2001, the Code requires compliance with the requirements of the amended zoning ordinance. Paper no. 5, at 3; Paper no. 8, Ex. 1, 2.

## II. Standard for granting Preliminary Injunction

A district court deciding whether to grant a preliminary injunction must "balance the hardship likely to befall the parties if the injunction is, or is not, granted." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 416–417 (4th Cir. 1999), *citing Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977). In balancing the hardships, the court considers the following four factors:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest.

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir.1991). Plaintiff bears the burden of establishing that these factors favor injunction. *Id.*

The traditional first step in this analysis is the balance of the possible harms to the plaintiff of denying the motion against the harm to the defendant of granting it. *Blackwelder*, 550 F.2d at 196. This comparison will affect the standard that Plaintiff must meet as far as showing likelihood of success on the merits:

> If, after making this comparison, the district court concludes that the balance of potential hardships favors the plaintiff, then "it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." Nevertheless, where it is legally impossible for a plaintiff to succeed

on the merits of its underlying claim, the district court may not grant the requested injunction, no matter how severe or irreparable an injury the plaintiff may otherwise suffer.

*Hoechst*, 174 F.3d at 417, *quoting Blackwelder*, 550 F.2d at 196; *citing Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir.1975).

## III. Analysis

Bigg Wolf seeks a preliminary injunction prohibiting enforcement of the zoning provisions pending the outcome of this case, asserting that the provisions are not a constitutional time, place, and manner ("TPM") restriction on speech protected by the First Amendment. Bigg Wolf claims that the County did not satisfy the standard for such zoning restrictions set forth in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), because it did not actually rely on appropriate studies of adverse secondary effects to justify the zoning, narrowly tailor the zoning to combat those secondary effects, and provide reasonable alternative means of communication. Bigg Wolf points not only to its alleged likelihood of success on the merits under current case law, but also to a case pending in the Supreme Court, *Alameda Books, Inc. v. City of Los Angeles*, 222 F.3d 719 (9th Cir.2000), *cert. granted*, 532 U.S. 902, 121 S.Ct. 1223, 149 L.Ed.2d 134 (2001), *argument held*, 70 USLW 3382 (Dec. 4, 2001). Oral arguments were held recently and, though factually not identical to the current case, Bigg Wolf alleges that the resolution of that case may require the Court to determine the degree to which a secondary effects study must be relevant to the specific businesses sought to be regulated. Paper no. 5, at 19–21. Therefore, it argues that an injunction is necessary to maintain the status quo at least pending

the outcome in *Alameda Books,* if not the outcome in the current case.

Montgomery County Ordinance No. 14–19, which contains the amendments to the zoning ordinance, refers to the land use studies of eight other cities concerning the secondary effects of adult businesses in those cities and states that, "[i]t is the Council's objective to minimize and control these secondary effects and thereby protect the health, safety and welfare of the citizens." Paper no. 8, Ex. 1, at 3. According to the County, this statement demonstrates that the purpose of the amendments was not to regulate the content of speech engaged in by adult businesses, but to "prevent the adverse secondary effects caused by adult businesses." *Id.*

Bigg Wolf asserts that in enacting the zoning provisions, the County merely set forth that it was "aware of" studies from other municipalities, but did not show that the studies were actually read by the County Council before enacting the amendments. Paper no. 5, at 6. Moreover, Bigg Wolf contends that the studies listed by the County do not exclusively address sexually explicit retail establishments, instead lumping them in with strip clubs and other live entertainment. *Id.* Both parties agree that the County did not conduct any of its own studies into the negative secondary affects of adult businesses.

The County has not yet enforced the zoning provisions against Bigg Wolf or against any other adult entertainment businesses. Paper no. 8, at 31. Bigg Wolf claims that, by the County's admission in a related case[3], at least six current retail stores would need to relocate within the designated zones if the Zoning provisions are enforced. Paper no. 5, at 4.

The greatest factual dispute between the parties relates to the number of constitutionally available lots to which Bigg Wolf could relocate pursuant to the ordinance. The County contends that 33 such lots exist. Testimony of Reginald Jetter, Preliminary Injunction Hearing, January 29, 2002. Bigg Wolf, however, points to affidavits filed by an expert who, using data provided by the County in a related case, pared the number of available sites down to only seven. Paper no. 5, Ex. 3, 4. Part of the disparity between the numbers arrived at by each party can be explained by a disagreement over the proper standard for determining whether a site is constitutionally available. Bigg Wolf contends that even the seven sites which it admits exist are not economically feasible for relocation and should not be considered. Paper no. 5, at 7.

Neither of the parties has yet demonstrated conclusively the number of sites that are available. At the hearing, the County presented maps showing 33 available sites at the current time though, upon consideration of the 750 foot separation requirement, the County's witness admitted that a number of those sites would be unavailable if an adult business actually relocated to another nearby site. Given the separation requirement, the County admitted that no more than twenty of the 33 sites would be available if all of the existing adult businesses chose to relocate to the three zones.

It is unquestioned that, in its current configuration, the store would be classified as an adult entertainment business subject to the enforcement of the amended zoning ordinances. In order to remain in

---

**3.** In a related case, *Mid–Atlantic Management Corp. v. Montgomery County,* DKC 2001–1822, the owner of a retail establishment similar to Bigg Wolf's challenges the same zoning ordinance. Both the County and Bigg Wolf agreed that, unless otherwise introduced as evidence, the record in Mid–Atlantic is not applicable here, though the court may take judicial notice.

its current location, the store would have to reduce its retail space devoted to adult merchandise from over 50% to 10%. Otherwise, the store is required by the ordinance to relocate to an I–1, I–2, or C–2 zoning district and remain 750 feet from protected uses.

Bigg Wolf did not bring this challenge to the zoning provisions until after the expiration of the amortization period. Despite claiming that it has made diligent attempts to find suitable sites for relocation since the ordinance was passed (Paper no. 9, Ex. 1), by its own admission Bigg Wolf did not extensively explore the possibilities for relocation until the amortization period expired. Biggs, Hearing Testimony.

The court will first address the likelihood of success factor, despite the traditional order of analysis, because that factor affects the type of hardships faced by the parties. Bigg Wolf alleges that enforcement of the ordinance will cause a deprivation of its First Amendment rights, the loss of which, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(plurality opinion). If the enforcement of the zoning ordinance at issue would likely result in the loss of First Amendment freedoms, the harm to Bigg Wolf would be irreparable and the need for preliminary injunctive relief greater.[4] However, if there is no substantial likelihood that First Amendment freedoms would be lost because the zoning appears properly directed at secondary effects rather than the protected content of adult businesses, then any harm would not likely be to the Plaintiff's First Amendment rights, but would instead be economic, and

so would not be irreparable. Therefore, because the type of injury to be suffered by the parties significantly affects the analysis, it is preferable to move directly into an inquiry of Bigg Wolf's likelihood of success on the merits of its claim.

**A. Likelihood of Success on Merits**

As will be seen, Bigg Wolf cannot meet even the more easily satisfied requirement of presenting a serious question on the merits, although, on this record, it is not appropriate to grant summary judgment to the County.

■■■ The First Amendment protects non-obscene, sexually explicit speech. *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). The level of scrutiny applied to a regulation is determined by whether that regulation is aimed at the contents of protected speech. "In sum, regulations that affect First Amendment interests and are content-based are evaluated under 'strict scrutiny'; regulations that affect First Amendment interests but are content-neutral are evaluated under 'intermediate scrutiny.' " *N.W. Enterprises, Inc. v. City of Houston,* 27 F.Supp.2d 754, 773 (S.D.Tex.1998), citing *Renton,* 475 U.S. at 46–47, 106 S.Ct. 925; *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). In order to determine whether a regulation that affects speech is content-based or content neutral, "courts look primarily to the respective government's purpose in enacting the regulation." *University Books and Videos, Inc. v. Metropolitan Dade County,* 33 F.Supp.2d 1364, 1369 (S.D.Fla.1999), citing

---

4. In *Erie Boulevard Triangle Corp. v. City of Schenectady,* 152 F.Supp.2d 241 (N.D.N.Y. 2001), the court issued a preliminary injunction where the plaintiff demonstrated a substantial likelihood that the harm to the plaintiff that would occur if an Adult Ordinance were enforced was "directly related to the protected content of plaintiff's businesses...." *Id.,* at 248.

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

In *Renton,* the Court upheld a local zoning ordinance that restricted the possible locations for adult businesses, even those engaging in constitutionally protected speech, as a constitutional TPM restriction. Though that ordinance, like the one at issue in this case, differentiated between sexually explicit and other uses, it was deemed content-neutral because the government's purpose in enacting it was to combat the adverse secondary effects that adult businesses are believed to have on the community. Thus, TPM restrictions that burden speech incidental to a content-neutral goal, similar to the one at issue in this case, have been upheld as valid exercises of municipalities' police power. *Renton,* 475 U.S. at 49–50, 106 S.Ct. 925; *see also City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Allno Enterprises, Inc. v. Baltimore County, Maryland,* 2001 WL 589423 (4th Cir.2001) (unpublished disposition); *D.G. Restaurant Corp. v. City of Myrtle Beach,* 953 F.2d 140 (4th Cir.1991); *David Vincent, Inc. v. Broward County, Florida,* 200 F.3d 1325 (11th Cir.2000). *D.H.L. Associates, Inc. v. O'Gorman,* 199 F.3d 50 (1st Cir.1999); *Phillips v. Borough of Keyport,* 107 F.3d 164 (3rd Cir.1997); *ILQ Investments, Inc. v. City of Rochester,* 25 F.3d 1413 (8th Cir.1994).

 Municipalities cannot justify zoning ordinances that incidentally impact speech merely by pointing to their content-neutrality. *Renton* sets forth the standard for determining whether such content-neutral zoning ordinances are constitutional:

> [R]egulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. On the other hand, the so-called "content neutral" time, place, and manner regulations are acceptable as long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

*Renton,* 475 U.S. at 46–47, 106 S.Ct. 925. In addition to the two explicit *Renton* requirements regarding substantial governmental interest and reasonable alternative channels, a content-neutral zoning ordinance that imposes distance and space requirements on adult businesses must be narrowly tailored to achieve the government interest. *See Ward,* 491 U.S. at 795–802, 109 S.Ct. 2746. In order to determine whether Bigg Wolf raises even a serious question on the merits, the court will analyze the extent to which the ordinance satisfies each of these constitutional requirements.[5]

1. Substantial governmental interest

In order to establish that the ordinance in question is aimed at a substantial governmental interest, the County must demonstrate that it is aimed at the negative secondary effects of adult entertainment businesses rather than the content of the speech. "[E]ven if a time, place, and manner ordinance regulates only businesses

---

**5.** In its briefs, Bigg Wolf also presses its claims that the zoning ordinance is void for vagueness and overbroad. Particularly, it argues that the statute is unconstitutionally vague because it cross-references the Maryland criminal code to derive the definitions of "sadomasochistic abuse", "sexual conduct" and "sexual excitement." Bigg Wolf contends that the ordinance is overbroad because the definition of adult entertainment business would include many "mainstream" businesses like Blockbuster and Barnes & Noble. However, Bigg Wolf did not press these claims in the hearing and admitted that its case would likely turn on its challenge to the ordinance as an invalid TPM restriction. Therefore, the court will not now consider Bigg Wolf's likelihood of success as to these claims.

selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen undesirable secondary effects attributable to those businesses, such as increased crime, lower property values, or deteriorating residential neighborhoods." *ILQ,* 25 F.3d at 1416. In *Renton,* the Court held that a municipality may rely on the secondary effects studies of other cities as evidence of secondary effects when drafting its ordinances. "The [Supreme] Court has not required that a municipality conduct new studies or produce evidence independent of that generated by other cities or towns, so long as whatever evidence the municipality relied upon is reasonably believed to be relevant to the problem sought to be addressed." *Renton,* 475 U.S. at 49–50, 106 S.Ct. 925.

In adopting the new zoning provisions, the County Council stated that it was aware of the secondary effects studies of a number of other municipalities and claimed that its purpose in amending the zoning was to combat and minimize harmful secondary effects associated with adult businesses. Paper no. 8, Ex. 1, at 3. Plaintiff contends that the County did not demonstrate that it actually read these studies in making its zoning determinations and so cannot prove that they were reasonably believed to be relevant to the problems the County addresses. Paper no. 5, at 16. This argument is meritless.

In *Erie,* the Supreme Court upheld an ordinance banning nudity in public places where the city relied on the secondary effects studies of other cities. Citing the "reasonably believed" test from *Renton,* the Court held that:

> [b]ecause the nude dancing at Kandyland is of the same character as the adult entertainment at issue in *Renton, Young . . .* and *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), it was reasonable for Erie to conclude that such nude dancing was

likely to produce the same secondary effects. And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and [*Young* ] to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood.

*Erie,* 529 U.S. at 296–297, 120 S.Ct. 1382, *citing Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. Not only does the preamble to the County's ordinance contain references to the studies and explicitly state that the purpose of the zoning ordinance is to combat the secondary effects cited in the studies, but the County attaches the studies in question to its opposition here so that the court is clearly apprised of the problems the County thought it was facing. See *Phillips,* 107 F.3d at 174. As in *ILQ,* 25 F.3d at 1416–1417, the legislative history demonstrates that the County has likely satisfied this element of the *Renton* standard.

### 2. Narrow tailoring

When analyzing the constitutionality of the ordinance under the first element of the *Renton* test, whether it serves a substantial government interest, the question was whether the County reasonably believed it was relying on the studies it cited in passing the ordinance. Here, however, the question is not whether the County properly relied on the studies *per se,* but rather whether those particular studies cited by the County can support a TPM restriction on Bigg Wolf's type of business. Though it does not say so in as many words, Bigg Wolf's challenge to the relevance of the secondary effects studies cited by the County, Paper no. 5, at 16–18, · is actually a challenge to the narrow tailoring of the ordinance to the problems explicated in those studies. In other words, Bigg Wolf contends that the studies cited by the County do not justify a 10% floor space

limit for adult materials where there is no on-site video viewing.[6]

■ "A content-neutral time, place, and manner restriction is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *D.H.L. Associates, Inc. v. O'Gorman,* 199 F.3d 50, 59 (1st Cir.1999), *quoting Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (internal quotations omitted). The ordinance in *Renton* was found to be narrowly tailored because it, "affects only that category of theaters shown to produce the unwanted secondary effects." *Renton,* 475 U.S. at 52, 106 S.Ct. 925. This is not a strict test. The County need not prove that Bigg Wolf, or a store with just over 10% of its floor space devoted to adult material, would likely have the exact same adverse effects on the surrounding community as those in the studies it cites as long as the ordinance, "affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects…" *ILQ,* 25 F.3d at 1418. In other words, the ordinance need not adopt the least restrictive alternative by focusing on the precise adverse effects cited in the studies in order to pass constitutional muster. The County, "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion).

It is enough that the County pointed to a number of secondary effects studies which demonstrate the secondary effects of a variety of adult entertainment businesses when drafting the ordinance. Plaintiff contends that the Supreme Court will have to address this issue in the pending *Alameda Books* case. While there is a chance the Court will address the degree to which a secondary effects study must be relevant to the specific businesses sought to be relocated, *Alameda Books* is factually dissimilar to the current case, addressing whether a combination of adult entertainment businesses in one store presents the same risk of secondary effects as two adjacent adult entertainment businesses. Furthermore, the Court's recent decision in *Erie,* 529 U.S. at 296–297, 120 S.Ct. 1382, where it held that Erie could justify a ban on activity that was of the same character as adult entertainment in *Renton* and *Young,* indicates that the studies do not have to be directly on point in order to pass the narrow tailoring test. The test is whether stores like Bigg Wolf's or others covered by the ordinance are part of a category reasonably believed to cause some of the secondary effects referred to in the studies. *See ILQ,* 25 F.3d at 1418. Bigg Wolf has provided no evidence tending to show that a store with more than 10% of its floor space devoted to adult material could not reasonably be believed to cause some of the negative secondary effects set forth in the studies and commonly associated with a variety of adult entertainment businesses. Accordingly, the County is likely to meet the relatively easy burden of narrow tailoring.

3. Reasonable alternative channels of communication

The parties raise two separate disputes relating to whether the zoning ordinance provides reasonable alternative channels of communication, one legal and one factual. On one hand, Bigg Wolf and the County

---

**6.** There is a question of whether Bigg Wolf has standing to challenge the 10% space limit because, by its own admission, more than half of its retail space is devoted to adult entertainment material. However, since, for reasons stated below, Bigg Wolf cannot demonstrate a likelihood of sustaining this challenge, for the present purposes it is not necessary to resolve the issue of Bigg Wolf's standing.

disagree about the standard for determining whether a site is "available" for relocation and so could be considered an alternative channel of communication. This legal dispute actually encompasses four related determinations: 1) whether to consider the sites available to Bigg Wolf individually or to the group of adult entertainment businesses affected by the ordinance as a whole, 2) whether to consider the reasonableness of alternative avenues of communication at the time the ordinance was passed, at the time suit was filed, at present, or at a time looking forward and projecting the potential number of businesses that might need to locate in the designated zones, 3) whether the site needs to be economically feasible for an adult entertainment business or merely physically available, and 4) whether the sites need to be actually available for sale or rent or merely potentially available. On the other hand, the parties also have a factual dispute, dependent in part on a resolution of the legal questions presented above, over the number of sites that are available within the I–2, I–2 and C–2 zones. One significant part of the parties' dispute relates to the number of available sites once the 750 foot separation rule is taken into account. For example, once a business moves to site A, it remains unclear how many other sites are within 750 feet of site A and so would become unavailable given the location of site A. It is also unclear after the hearing whether the County took this requirement into consideration when determining the number of available alternative sites. However, the legal dispute will actually be determinative of whether a reasonable number of sites exist because the expert relied upon by Bigg Wolf agrees that, alleged constitutional infirmities aside, seven sites do exist in the relocation zones.

a) How to determine which sites are available

Neither the Supreme Court nor the Fourth Circuit has completely refined the test from *Renton* for determining whether particular sites are constitutionally reasonable for adult entertainment business relocation. A case from the Eleventh Circuit, *David Vincent, Inc. v. Broward County, Florida,* 200 F.3d 1325 (11th Cir.2000), synthesizes the rulings from other circuits and provides a guideline for answering these questions regarding how to determine the type of sites that should be considered available:

First, the economic feasibility of relocating to a site is not a First Amendment concern. Second, the fact that some development is required before a site can accommodate an adult business does not mean that the land is, per se, unavailable for First Amendment purposes.... Examples of impediments to the relocation of an adult business that may not be of constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the cost of generally applicable lighting, parking or green space requirements; making due with less space than one desired; or having to purchase a larger lot than one needs. Third, the First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated by adult use by the zoning ordinance. It is of no import under Renton that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.

*David Vincent,* 200 F.3d at 1334–1335.

Bigg Wolf contends in its brief that the lack of economic feasibility of the sites set

forth by the County render them unavailable. However, according to *Renton*, the only requirement is that adult entertainment businesses that need to relocate should be, "on an equal footing with other prospective purchasers and lessees." *Renton*, 475 U.S. at 54, 106 S.Ct. 925. *Renton* does make clear that commercial viability is not the appropriate consideration. *Id.*, *See also David Vincent*, 200 F.3d at 1334. This is further supported in *D.G. Restaurant*, 953 F.2d at 147, where the Fourth Circuit held that the commercial desirability of sites in an industrial zone is irrelevant. Instead, the standard is that, "... an obstacle that can be overcome without incurring unreasonable expense does not make a site unavailable, but an obstacle that cannot reasonably be overcome renders the site unavailable." *Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir.1995). That court described unavailable areas as those lacking infrastructure, unsuitable for generic commercial development or "land under the ocean, airstrips of airports, sports stadiums...." *Id.* It is clear that economic feasibility is not the appropriate determination of whether a site is available.

Bigg Wolf asserts that, currently, none of the landlords and owners in the available zones will rent or sell to it and argues that this makes those sites unavailable. The test from *David Vincent* makes it clear that local governments are under no obligation either to dictate that third parties make their land available to adult entertainment establishments or even to consider whether restrictive covenants or leases exist among third parties rendering a site unavailable. *See Centerfold Club, Inc. v. City of St. Petersburg*, 969 F.Supp. 1288, 1302 (M.D.Fla.1997). In *Woodall*, owners' unwillingness to rent or sell to an adult business and the fact that the land is currently unavailable for sale or lease were not considered relevant for constitutional availability under *Renton*. *Id.*, at 1125–26.

Therefore, for the purposes of *Renton*, these considerations are irrelevant and the fact that none of the landlords will rent to Bigg Wolf does not make those sites unavailable. Accordingly, the third and forth questions set forth above relating to constitutional "availability" have been resolved in favor of the County's contentions.

The first two legal questions set forth above are related; whether to consider the businesses as a group or individually and at what point in time to judge reasonable alternative sites. Although many courts have not explicitly said so, most have logically analyzed the number of available sites in relation to the number of adult businesses that would need to relocate at the time the ordinance was passed. The situation will always be fluid, with businesses moving in and out, and the courts should not be involved repeatedly with litigation determining the validity of a zoning ordinance. More importantly, if the reasonableness of alternative sites must be reassessed for each business at the time it decides to relocate, an incentive would be created for businesses to hold-out and then to claim that there are no available sites after the other businesses have relocated or litigated. Such a situation not only puts enormous bargaining leverage in the hands of the last holdout, it is a nonsensical way to deal with zoning problems.

To the extent that it considers this question, the case law from other circuits supports this time-frame. "The test is whether the restrictions allow for reasonable alternative avenues of communication *currently*, not whether they *always will allow* for reasonable alternative avenues of communication." *The Ranch House, Inc. v. Amerson*, 146 F.Supp.2d 1180, 1212–1213 (N.D.Ala.2001). Even the Ninth Circuit, which has a more stringent requirement for adequate alternative channels than this circuit, looks at the number of adult enter-

tainment business that must be relocated at the time that the new zoning regime takes effect. *See Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1532–33 (9th Cir.1993). Most courts considering this question implicitly adopt this time frame and there are no cases that challenge it or demand that the test for available sites include safeguards for future change. *Ranch House,* 146 F.Supp.2d at 1213. Therefore, the court will consider the number of adequate sites relative to the number of adult entertainment businesses in place at the time the ordinance was passed.

### b) Factual dispute immaterial

Even the expert relied upon by Bigg Wolf agrees that there are at least seven sites available for the six adult entertainment businesses which needed relocating at the time the ordinance was passed. Paper no. 5, Ex. 3, 4. Having resolved above that sites need not be economically feasible or presently available to be constitutionally available, the court is satisfied that it is likely that at least these seven sites pass constitutional muster. Moreover, despite doubt shed at the hearing on the County's contention that there are 33 available sites once the 750 foot separation requirement is taken into consideration, it appears likely that more than seven sites, possibly as many as twenty, are constitutionally available. The *Renton* test does not prescribe a set number or ratio of sites required, but merely states that it must be "reasonable." Courts considering this question have come up with a variety of formulae, but even the Ninth Circuit, generally more hostile to these types of zoning ordinances, has held that number of sites available must merely be greater than or equal to number of adult entertainment businesses in existence at the time the new zoning regime takes effect. *See Topanga Press,* 989 F.2d at 1532–33. Therefore, once concerns about their constitutional availability

are removed, even the number of sites available by Bigg Wolf's admission is greater than the number of businesses that need to move. Accordingly, as this appears to satisfy even the most generous formulation of the test for reasonable alternative avenues of communication, it appears unlikely Bigg Wolf could demonstrate that the zoning ordinance fails to pass constitutional muster.

### B. Balance of Harms

■ Because the County's zoning ordinance appears to be a proper TPM restriction, aimed at the secondary effects of adult businesses rather than the content of the speech and providing reasonable alternative avenues for communication, there is no serious question that Plaintiff might suffer harm to its First Amendment rights if the ordinance is enforced. When there is no likely irreparable First Amendment injury, the only harms of which Bigg Wolf can complain are economic harms from relocating or reducing its display of adult material. At least in part, these harms were brought upon itself when Bigg Wolf, by the admission of its owner at the hearing, decided not to explore relocation extensively or to litigate within the 18–month amortization period. Accordingly, if Bigg Wolf is forced to close or reduce its stock rather than to relocate because it cannot immediately find a new site, the cost was largely visited upon itself by its failure to utilize the 18–month window. More importantly, because Bigg Wolf does not satisfy the test of at least demonstrating a serious question on the merits, the balance is strongly weighed against granting the preliminary injunction.

Plaintiff has the burden of satisfying the test for granting the preliminary injunction. *See Direx Israel,* 952 F.2d at 812. While it is premature to determine that it is legally impossible for Bigg Wolf to pre-

vail on the merits, especially where there is some uncertainty about the sites available in the relocation zones, the County has strong public policy reasons to act in the general welfare to fight the secondary effects cited in the studies and Bigg Wolf failed to act during the 18–month amortization period. Accordingly, the court will deny the motion for preliminary injunction.

## IV. Conclusion

Bigg Wolf fails to satisfy the test for granting a preliminary injunction because it cannot demonstrate even a serious question on the merits as to its First Amendment claims. Accordingly, Bigg Wolf's motion for preliminary injunction will be DENIED. A separate order will be entered.