**EXECUTIVE ARTS STUDIO, INC,**
d/b/a Velvet Touch, Plaintiff,

v.

**CITY OF GRAND RAPIDS, Defendant.**

No. 1:01–CV–196.

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 30, 2002.

Allan S. Rubin, Rubin & Rubin, Southfield, MI, Gregory F. Lord, Gregory Fisher Lord, PC, Sterling Heights, MI, for Plaintiff.

Daniel A. Ophoff, Grand Rapids, MI, Scott D. Bergthold, Scottsdale, AZ, for Defendant.

## OPINION

QUIST, District Judge.

Plaintiff, Executive Arts Studio, Inc. d/b/a Velvet Touch ("Executive Arts"), filed this action seeking declaratory and injunctive relief against Defendant, the City of Grand Rapids (the "City"). In its first amended complaint, Executive Arts alleges, among other things, that Ordinance No. 77–31, being that part of the City's Zoning Ordinance which regulates adult businesses, and Ordinance No. 01–07, which amended the definition of "adult bookstore" under the City's Zoning Ordinance, are unconstitutional as applied to Executive Arts. Now before the Court are Executive Arts' motion for summary judgment and the City's motion to dismiss.[1]

## I. Facts

### A. Ordinances 77–31 and 01–07

On July 5, 1977, the Grand Rapids City Counsel approved and adopted Ordinance 77–31, which added Article 25 as Sections 5.283 through 5.288 of the City's pre-existing Zoning Ordinance. The subject of Ordinance 77–31 is regulated uses, including adult uses. The ordinance was based in large part upon the City of Detroit regulated use ordinance upheld in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), which provided for dispersal, rather than concentration, of regulated uses, including adult movie theatres. The purpose of Ordinance 77–31 is summarized in the introductory paragraph:

> In the development and execution of this Ordinance, it is recognized that there are some uses which, because of their very nature, have serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances or when one or more of them are located in near proximity to a residential zone, thereby having a deleterious effect upon

---

1. The Court heard oral argument on the instant motions on June 26, 2002. Following oral argument, the Court set a briefing schedule for the parties to submit cross-supplemental briefs and responses to the cross-supplemental briefs. The Court has now received and reviewed the supplemental briefing submitted by both parties.

the adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood.... These controls are for the purpose of preventing a concentration of these uses within any one area, or to prevent deterioration or blighting of a nearby residential neighborhood....

(Ordinance 77–31, Zoning Ordinance art. 25, § 5.283(1), Pl.'s App. at 015.)[2] The ordinance specifies eleven separate uses, including adult book stores, adult cabarets, adult motion picture theatres, pool or billiard halls, and public lodging or rooming houses. (§ 5.283(2).) A use is permitted if it: (1) is located within a district where it is normally permitted; (2) is not located within 500 feet of a residential zone district; and (3) is not located within 1000 feet of two other regulated uses.[3] (§ 5.285.)

Ordinance 77–31 defines an adult bookstore as:

An establishment having as a *substantial or significant portion* of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as defined herein, or an establishment with a *segment or section* devoted to the sale or display of such material.

(§ 5.284(2) (italics added).)[4] In applying the "adult bookstore definition," the City has historically interpreted the phrase, "substantial or significant portion," as modifying the phrase "section or segment." (Hoyt Dep. at 39–43, Pl.'s App. at 124–25; Thompson Dep. at 28–32, Pl.'s App. at 145–46.) Thus, while the language of the definition contains two triggers to its application—"substantial or significant" and "section or segment"—the City's administrative interpretation was that a business qualified as an adult bookstore only if a "substantial or significant portion" of its stock in trade consisted of adult books. (Thompson Dep. at 31.) Using this interpretation, the City had determined that a store with no more than 5% of its stock consisting of adult materials would not constitute an adult bookstore under the ordinance. (*Id.* at 40–41.)

Prior to February 27, 2001, Article 25 of the Zoning Ordinance had been amended several times to include additional regulated uses. These amendments did not affect the stated purpose of the regulated use ordinance or the definition of "adult bookstore". On February 27, 2002, however, the City Commission adopted Ordinance 01–07, which amended the definition of adult store as follows:

An establishment having a substantial or significant portion of its stock in trade devoted to the sale, rental, trade, exchange or display of any combination of books, magazines, and other periodicals, film, video tapes, video discs, greeting cards, pictures, or other visual, electronic or digital media, which are distin-

---

**2.** Throughout the balance of this Opinion the Court will refer to Ordinance 77–31 by the particular sections of the Zoning Ordinance.

**3.** The second and third requirements may be waived by the Zoning Board of Appeals if certain conditions are met.

**4.** "Specified sexual activities" include: "(a) [h]uman genitals in a state of sexual stimulation or arousal;" (b) "[a]cts of human mas-

turbation, sexual intercourse or sodomy; [or] (c) [f]ondling or other erotic touching of human genitals, pubic region, buttock or female breast." (§ 5.284(3).) "Specified anatomical areas" include fully exposed or opaquely covered genitals, pubic region, a specified portion of the female breast and male genitals in an erect state, even if completely covered. (§ 5.284(4).)

guished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas", as defined herein, or an establishment with a segment or section devoted to the sale, rental, trade, exchange or display of such material.

(Ordinance 01–07, Pl.'s App. at 033.)

## B. Executive Arts' Store

For several years, Executive Arts operated an adult-oriented boutique under the name "Velvet Touch" in a municipality adjacent to the City. Velvet Touch sold, among other things, adult gifts, videos, and books. In August 2000, Executive Arts lost its lease and was forced to find a new location. Executive Arts chose a site located within the City on East 28th Street. The new site happened to be located within 500 feet of a residential zone and within 1,000 feet of another "adult use" business. On October 11, 2000, Executive Arts submitted an application for a variance from that portion of the City's Zoning Ordinance which regulates adult businesses. Based upon the application, Executive Arts apparently believed that it was a regulated use. In its variance application, Executive Arts represented that it intended to operate an adult-oriented gift and bookstore having approximately 3% of its floor space devoted to sexually-explicit magazines. After reviewing the variance application and obtaining an opinion from its legal department, the City's Planning Department determined that a business having only 3% of its stock in trade devoted to adult magazines, such as that proposed by Executive Arts, would not be a regulated use.

## C. ZBA Proceedings and State Court Litigation

Michael Vredevoogd ("Vredevoogd"), who lived adjacent to Executive Arts' store, and others who were unhappy with the Planning Department's determination, appealed to the Grand Rapids Zoning Board of Appeals ("ZBA"), seeking reversal of the Planning Department's decision that Executive Arts' proposed business would not be a regulated use. On December 8, 2000, the ZBA voted to uphold the Planning Department's decision. Following the ZBA's decision, Executive Arts closed on the building, remodeled it, and opened for business, limiting its stock of sexually-explicit magazines to 3% of its floor space.

On January 3, 2001, Vredevoogd filed an action in the Kent County Circuit Court seeking review of the ZBA decision. The case was assigned to Judge Dennis C. Kolenda. On February 22, 2001, Judge Kolenda issued an opinion in which he determined that Executive Arts was an adult bookstore because an area of its store was a "section or segment" devoted to the sale of sexually-explicit magazines, in spite of the fact that such stock may have comprised only 3% of total floor space. In other words, Judge Kolenda held that the City's interpretation was wrong because the definition of adult book store encompasses stores with either: (1) a substantial or significant portion of their stock in trade devoted to sexually-explicit books and magazines; or (2) a segment or section devoted to the sale or display of such materials. Judge Kolenda issued an order reversing the ZBA decision and remanding the matter to the ZBA for consideration of the original variance request, but retaining jurisdiction over the matter. Shortly after the decision, Executive Arts removed all sexually-explicit magazines from its store, and the City adopted Ordinance 01–07 expanding the definition of adult bookstore to cover videos and other media forms.

On May 3, 2001, the ZBA, on remand from the circuit court, denied Executive Arts' variance request. In making its determination, the ZBA only considered Executive Arts' request for a variance to operate as an adult bookstore selling adult books and magazines; it did not consider whether Executive Arts' store was a nonconforming use under Ordinance 01–07. Executive Arts appealed the ZBA's determination to Kent County Circuit Court. In connection with that appeal, Executive Arts filed a notice pursuant to *England v. Louisiana Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), reserving its right to litigate any federal claims in federal court. (Amended Notice of Reservation of Federal Claims/Defenses, Pl.'s App. at 062–63.) Oral argument was held on September 26, 2001, and Judge Kolenda issued an opinion and order on October 11, 2001, affirming the ZBA's decision. In his ruling, Judge Kolenda reached the following conclusions: (1) Ordinance 01–07 supplied the applicable definition of "adult bookstore" for purposes of the appeal; (2) Executive Arts' business was not entitled to nonconforming-use status; (3) the ZBA's denial was proper and there was no ground for reversal; (4) remand to the ZBA for consideration of the variance request under the amended ordinance was unnecessary because the ZBA would likely reach the same result; and (5) the amended ordinance was neither unconstitutionally vague nor overbroad under the First Amendment. As a result of the order, Executive Arts has removed all sexually-explicit materials from its shelves.

### D. The Federal Court Litigation

Executive Arts filed this case on March 29, 2001, pursuant to 42 U.S.C. § 1983, alleging that the provisions of Article 25 of the Zoning Ordinance pertaining to "adult book stores" as adopted in Ordinance 77–

31 are unconstitutional under the First and Fourteenth Amendments. Executive Arts later filed an amended complaint alleging that Ordinance 77–31 and Ordinance 01–07 both infringed Executive Arts' First Amendment rights and adding separate due process and equal protection claims. On October 9, 2001, this Court entered an Opinion and Order denying the City's motion for this Court to abstain under the *Younger* abstention doctrine.

### II. *Discussion*

### A. The City's Motion to Dismiss

 The City argues in its motion that the *Rooker–Feldman* doctrine and the Full Faith and Credit Statute, 28 U.S.C. § 1738, preclude this Court from considering Executive Arts' constitutional claims because Executive Arts submitted those claims to the state court and the state court fully decided those issues. The *Rooker–Feldman* doctrine provides "that lower federal courts do not have jurisdiction to review a case litigated and decided in state court [because] only the United States Supreme court has jurisdiction to correct state court judgments." *Gottfried v. Med. Planning Servs., Inc.,* 142 F.3d 326, 330 (6th Cir.1998). In order for the doctrine to apply, the claims presented to the federal court must have been "inextricably intertwined" with the judgment of the state court. *D.C. Ct. of Appeals v. Feldman,* 460 U.S. 462, 486–87, 103 S.Ct. 1303, 1317, 75 L.Ed.2d 206 (1983). Although Executive Arts presents other arguments why the *Rooker–Feldman* doctrine is inapplicable in this case, the Court will first consider whether Executive Arts' purported *England* reservation preserved its constitutional claims in this Court because a valid *England* reservation precludes application of the *Rooker–Feldman* doctrine. *Instructional Sys., Inc. v. Com-*

*puter Curriculum Corp.*, 35 F.3d 813, 820–21 n. 12 (3d Cir.1994).

In *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Supreme Court identified a procedure through which a federal plaintiff forced to resort to state court as a result of *Pullman*-type abstention, *see R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), could preserve his right to have his federal claims decided in a federal forum. The plaintiffs in that case were graduates of chiropractic schools who sought to practice in Louisiana without having to comply with the educational requirements of the Louisiana Medical Practice Act. The plaintiffs filed suit in federal court alleging that as applied to them, the act violated the Fourteenth Amendment. A statutory three-judge court sua sponte invoked the doctrine of abstention, reasoning that a state court might end the controversy by finding that the act did not apply to the plaintiffs. The plaintiffs then commenced suit in Louisiana state court but did not restrict their claims to state law issues. Instead, they alleged, briefed, and argued their constitutional claim because they believed they were required to do so under the Supreme Court's decision in *Government and Civic Employees Organizing Committee v. Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), which held that a plaintiff challenging the applicability of a state statute must inform the state court of the federal claims so that the state court may construe the statute in light of those claims. The Supreme Court observed that while the purpose of abstention is to promote comity between state and federal courts, the doctrine should not deprive a plaintiff of a federal forum to resolve constitutional claims:

> There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims. Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." Nor does anything in the abstention doctrine require or support such a result. Abstention is a judge-fashioned vehicle for according appropriate deference to the "respective competence of the state and federal court systems." Its recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.

*England*, 375 U.S. at 415–16, 84 S.Ct. at 464–65 (citations and footnote omitted). On the other hand, the Court found "no reason why a party, after unreservedly litigating his federal claims in the state courts although not required to do so, should be allowed to ignore the adverse state decision and start all over again in the District Court." *Id.* at 419, 84 S.Ct. at 466. Thus, in order to give effect to *Windsor* without forcing plaintiffs to litigate their federal claims in state court, the Court held that in a case remanded back to state court pursuant to *Pullman*, a party may preserve its right to litigate its federal claims in federal courts by notifying the parties and the state court that it is reserving its federal claims and limiting

the issues in the state court proceeding to state issues. *Id.* at 421, 84 S.Ct. at 467–68. The Court noted, however, that a party may still lose its right to litigate in federal court, even after making such a reservation, if "it clearly appears that [it] voluntarily did more than *Windsor* required and fully litigated his federal claims in the state courts." *Id.* at 421, 84 S.Ct. at 468.

The City argues that Executive Arts' *England* reservation cannot preserve Executive Arts' federal claims because, as the City correctly notes, this Court did not abstain under *Pullman* or any other recognized abstention doctrine. In fact, this Court denied the City's motion to abstain under the *Younger* abstention doctrine. Even had this Court abstained under *Younger*, Executive Arts could not claim the benefit of its *England* reservation because *England* does not apply when a federal court abstains pursuant to *Younger*. *United Parcel Serv., Inc. v. Cal. Pub. Utils. Comm'n*, 77 F.3d 1178, 1184 n. 5 (9th Cir.1996). That does not mean, however, that *England* has no application in this case or that this Court is required to ignore the concerns the Supreme Court expressed in *England* regarding a plaintiff's right to have a federal court decide his federal claims. In fact, in filing its *England* reservation in the state court, Executive Arts did everything it could (subject to the possibility of later waiving its rights by presenting its federal claims to the state court) to preserve its right to have its federal claims decided by this Court.

■ Executive Arts filed this lawsuit on March 29, 2000, more than a month prior to the time the ZBA issued its decision on remand from the state court denying the variance request. Prior to Judge Kolenda's February 22, 2001, opinion and order reversing the City's determination that Executive Arts was not an adult bookstore

under the Zoning Ordinance, Executive Arts had no reason to challenge the constitutionality of Article 25 because it had not suffered an adverse effect from the application of that law. Executive Arts raised its federal constitutional claims for the first time when it filed its complaint in this case, thus exercising its right to have its federal claims heard by a federal court. *See Ellwest Stereo Theaters Inc. of Tex. v. Byrd*, 472 F.Supp. 702, 705 (N.D.Tex.1979)(noting that "[i]t is hornbook law that a Plaintiff is entitled to have its federal claims heard in a federal forum as a general rule"). Executive Arts filed its *England* reservation in the state court only after it filed its request for review by the state court of the ZBA's May 3, 2001, decision denying the variance request. Although Executive Arts did not file its reservation pursuant to a federal court's decision to abstain, its reservation was nonetheless consistent with the purpose of an *England* reservation: to inform the state court and the parties that the reserving party intends to have its previously-filed federal claims decided by a federal court. The *England* reservation was thus a protective measure—in the event the Court, either *sua sponte* or on motion by the City, decided to abstain under *Pullman*. Executive Arts had good reason for its anticipatory filing, because at oral argument on the City's motion for abstention under *Younger*, the City's counsel conceded that *Pullman* was probably a more appropriate basis for abstention and requested an opportunity to file a supplemental brief on that issue. *See Executive Art Studio, Inc. v. City of Grand Rapids*, 179 F.Supp.2d 755, 757 (W.D.Mich.2001). This Court ultimately denied the City's motion without considering *Pullman* after the City failed to follow through in filing its brief.

*United Parcel Service, Inc. v. California Public Utilities Commission,* 77 F.3d 1178 (9th Cir.1996), answers the City's argument regarding the absence of abstention. In that case, the California Public Utilities Commission ("CPUC") issued a decision disallowing a rate increase by United Parcel Service ("UPS") prior to a certain date. UPS filed a motion for rehearing arguing, among other things, that the decision violated UPS' federal and state constitutional rights. The CPUC denied the motion, and on June 9, 1993, UPS filed a petition for a writ of review in the California Supreme Court, in which it reserved its federal constitutional claims pursuant to *England.* That same day, UPS filed an action in federal court raising its constitutional claims. Subsequently, the California Supreme Court denied UPS' petition without hearing or comment. Following that denial, the district court dismissed the federal action on res judicata grounds. In dismissing the case, the district court concluded that UPS' *England* reservation was ineffective because *England* applies only where a litigant files in federal court first and the federal court abstains under *Pullman.* The Ninth Circuit disagreed. First, the court noted that while some courts have held that a litigant must file in federal court first in order to reserve its rights pursuant to *England,* the Ninth Circuit has not insisted on such a rule.[5] *Id.* at

1183–85. Second, the court held that even though *Pullman* abstention was not present, UPS was still forced to litigate in state court. The district court held that UPS was not forced to litigate in state court because UPS had the option of foregoing the state court review process altogether and filing its federal claims in state court. The court of appeals rejected this reasoning because UPS would have lost the opportunity to pursue its state court claims if it failed to pursue the state court review process and would be subject to the preclusive effects of the CPUC decision. *Id.* at 1186. The court concluded:

> In sum, had UPS gone straight to the federal district court with its equal protection claim, it would not only have lost its state law claims, but also have been subject to a res judicata judgment by the federal court. Under these circumstances, we find that UPS was compelled to bring both actions, and hold that it did not thereby forego its opportunity to avail itself of *England.*

*Id.*

In this case, Executive Arts, having already filed its federal claims and invoked the jurisdiction of this Court, had no choice but to pursue review of the ZBA's decision, raising only state law claims, in state court.[6] Otherwise, it would have lost its

---

**5.** This is consistent with the Sixth Circuit's application of *England. See Barnes v. McDowell,* 848 F.2d 725 (6th Cir.1988). In *Barnes,* the plaintiff initiated a state court proceeding for review of a decision by the Kentucky Personnel Board sustaining the plaintiff's termination from his public employment. While the state action was pending, the plaintiff filed a complaint in federal court under § 1983. Later, the district court granted the plaintiff's motion to hold the federal litigation in abeyance pending the outcome of the state court litigation. After the state court proceedings concluded, the district court dismissed the federal action on grounds of issue preclusion. The Sixth Circuit reversed, holding that the

state court litigation presented a different issue than the plaintiff's § 1983 claim. *Id.* at 731. Furthermore, the court held that although the plaintiff did not make an *England* reservation in state court, he achieved the same effect "[b]y splitting on his own initiative the state and federal actions stemming from his discharge." *Id.* at 732. Thus, the court recognized that *England* could apply even in the absence of *Pullman* abstention.

**6.** As the Court noted in its previous opinion, the state court litigation was originally filed by Vredevoogd, not Executive Arts. *See* 179 F.Supp.2d at 760. Thus, Executive Arts did not seek relief in the state court until it ap-

right to review of the ZBA decision by the state court. In addition, as noted in *United Parcel Service,* had· Executive Arts failed to pursue ·its state law claims, it might have been subject to claim preclusion in this Court. Thus, in a sense, Executive Arts was "shunted from federal to state court[ ]," *England,* 375 U.S. at 418, 84 S.Ct. at 466, albeit not by abstention.

·Having concluded· that *England* is applicable under the circumstances in this case, the Court must decide whether, in spite of its *England* reservation, Executive Arts waived its rights by "voluntarily . . . and fully litigat[ing][its] federal claims in the state court[ ]." *Id.* at 421, 84 S.Ct. at 468. With regard to this issue, the Court notes that there is no evidence that Executive Arts presented its federal claims to the state court in its pleadings, briefs, or ·other papers filed in that case. The only basis the City cites for waiver are statements made by Executive Arts' counsel at oral argument in the state court. proceeding.

█ Based upon its review of the entire transcript of the oral argument, however, the Court concludes that there is no basis for a finding of waiver. As the City correctly points out, at times during oral argument Executive Arts' counsel stated his opinion that the definition of adult book store was "overbroad." (9/26/01 Hr'g Tr. at 5–6, Pl.'s App. at 068–69.) At one point, counsel stated:

> We think under the ordinance, even under the new ordinance, it has a situation where it says a substantial portion of its stock in trade of adult content. And in the last sentence it deals with segment or section—for sale for trade, exchange or display of such material. Your Honor, that, in and of itself, makes it overbroad. There is no need to have a statute of ordinance that says, on one

hand, if it is substantial and material, then it is regulated comment (sic). Again, it says if it's a segment or section. I think that minimizes the ordinance, any establishment, one book, one video, under this ordinance, would require an adult bookstore use variance.

(*Id.* at 8.) Counsel also engaged in the following exchange with the court:

· THE COURT: Why is it overbroad with regard to videos? .

MR. GANI: Well, in terms of—

THE COURT: Especially since you concede that a substantial portion of your business is videos. Even if it's too broad to the extent it would make. one or two videos a trigger for regulation, you can see that you've got a lot more than one or two.

MR. GANI: I do, your Honor. The . reason why I say that is because under the new ordinance it still adopts identical language in the beginning and the end. The beginning indicating a substantial significant portion of the stock, and at ends (sic) it then says segment or section. what it does is it leaves the definition of segment or section unfettered to be (speaking unintelligibly) arbitrary decision as to whether or not that constitutes a violation of the ordinance.

THE COURT: The Supreme Court clearly said that in these areas, if you're covered, you can't claim that somebody else might have a legitimate argument. Since you concede it's a substantial portion of your business, if this new ordinance applies to you, you're stuck with it, it looks to me.

pealed the ZBA's May 3, 2001, decision, more than a month after this case was filed.

(*Id.* at 14–15.) While it might appear from these statements that counsel was submitting the federal claims to the state court, in the end counsel clarified what was at issue when he stated: "I think that the ordinance, in and of itself, is defective on its face. *But, that's not a part of this argument. We're here on a limited appeal. This issue is appealing the* [ZBA's] *decision on remand.*" (*Id.* at 16.) Significantly, counsel never mentioned the First Amendment in his argument, nor did he ask Judge Kolenda to find the ordinance overbroad or unconstitutional. Rather, he limited his request for relief to a reversal of the ZBA's decision that Executive Arts was a regulated use or, in the alternative, a grant of a variance. (*Id.* at 17.) Moreover, Judge Kolenda never raised the overbreadth issue with the City's counsel, although the City's counsel noted that he did not address that argument in his brief because Executive Arts' counsel did not raise it in his brief. (*Id.* at 26.)

█ As noted above, by filing its *England* reservation in the first instance, Executive Arts made a deliberate choice to safeguard its right to have its previously-filed federal claims heard in federal court. Judge Kolenda was aware of the *England* reservation but took counsel's comments about the ordinances being overbroad as an indication that Executive Arts was waiving the rights asserted in the *England* reservation, even though counsel clarified that the appeal was limited to review of the ZBA's decision on remand. *See Instructional Sys., Inc. v. Computer Curriculum Corp.,* 35 F.3d 813, 821 (3d Cir.1994)(stating that "[i]t is the actions of the displaced litigant which are controlling"). Moreover, Judge Kolenda never asked Executive Arts' counsel whether he was waiving his expressly-reserved right and submitting his federal claims for decision to the state court. Under these circumstances, waiver will not be lightly in-

ferred. *Cf. Urban Outfitters, Inc. v. 166 Enter. Corp.,* 136 F.Supp.2d 273, 275 (S.D.N.Y.2001)(waiver of jury trial); *In re Vitamins Antitrust Litig.,* 120 F.Supp.2d 58, 66 (D.D.C.2000)(Fifth Amendment testimonial privilege). Thus, counsel's mere reference to a possible constitutional argument in the face of unequivocal conduct demonstrating an intent to reserve federal claims for federal court does not amount to a waiver. *See United Parcel Serv.,* 77 F.3d at 1186 (concluding that references to the federal constitution in a petition to the California Supreme Court were insufficient to negate the *England* reservation in a footnote on the first page of the petition). Therefore, Executive Arts' First Amendment claims are properly before this Court.

## B. Executive Arts' Motion for Summary Judgment

### 1. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## 2. Applicable Standard

■ Executive Arts moves for summary judgment on Counts I and II of its First Amended Complaint, which request the Court to declare that Article 25 of the Zoning Ordinance, as enacted through Ordinance 77–31 and amended by Ordinance 01–07, are void and unenforceable under the First and Fourteenth Amendments and to issue an injunction prohibiting the City from enforcing those provisions.[7] The Court's determination of these claims is governed by the legal standard set forth by the United States Supreme Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), for review of "content-neutral" time, place, and manner regulations. The Court in *Renton* held that a zoning ordinance enacted for the purpose of combating the secondary effects of adult theaters will not violate the First Amendment if it: (1) is designed to serve a substantial government interest; (2) is narrowly tailored to achieve the government interest; and (3) allows for reasonable alternative avenues of communication. *Id.* at 50, 52, 106 S.Ct. at 930–31. When it is shown that a law affects speech protected by the First Amendment, the burden is on the government "to justify impingements on First Amendment interests." *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984).

### a. Justification for the Ordinances

■ The Supreme Court has recognized for many years that a municipality has a legitimate interest in eliminating un-

desirable secondary effects caused by permissible commercial establishments: "the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976). Thus, regardless of a nature of the business—be it a factory, a slaughterhouse, or an adult entertainment establishment—a city is entitled to address its undesirable side effects through zoning. *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 1740, 152 L.Ed.2d 670 (2002)(Kennedy, J., concurring in the judgment). However, "[t]he purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech." *Id.* (Kennedy, J. concurring in the judgment); *see also City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000)(plurality opinion).

■ Even though municipalities have broad latitude in adopting solutions to secondary effects, they may not do so without "providing evidence that supports a link between [the perceived cause] and [its] asserted secondary effects." *Alameda Books, Inc.,* 122 S.Ct. at 1735 (plurality opinion). This is not a demanding standard. In *Renton,* the Court stated:

The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

---

7. Counts III and IV of the First Amended Complaint, which are not at issue here, allege due process and equal protection claims.

*Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931. Most recently, the Court stated:

> In *Renton,* we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest. This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books,* 122 S.Ct. at 1736 (plurality opinion) (citations omitted).

In *Renton,* the City of Renton adopted an ordinance prohibiting adult motion picture theaters from locating within 1,000 feet of any residential area, church, park, or school. In contrast to the ordinance at issue here, Renton's ordinance produced a concentration of adult-oriented businesses. Prior to adopting the ordinance, the city's planning and development committee held public hearings, reviewed the experiences of Seattle and other cities, and received a report from the city's attorney regarding developments in other cities. In holding that the ordinance was unconstitutional, the court of appeals ruled that the city failed to meet its burden of justification because it enacted the ordinance without the benefit of any studies relating to the particular problems or needs of Renton. The Supreme Court found such a burden unnecessary. The Court held that Renton was entitled to place substantial reliance on the prior experiences of and studies produced by Seattle, including the "detailed findings" by the Washington Supreme Court in its opinion upholding Seattle's ordinance, without conducting its own studies. *Renton,* 475 U.S. at 50–51, 106 S.Ct. at 930–31.

Executive Arts contends that the legislative record is insufficient to show that the City's justifications for adopting Ordinance 77–31 were based upon anything more than speculation and unsupported conclusions. In particular, Executive Arts argues that the City has failed to show that the ordinance is based upon any evidence showing that there is a link between adult bookstores and adverse secondary effects. The Court rejects this argument because the evidence in the record sufficiently demonstrates the purpose of the ordinance and the basis for its adoption. First, the minutes of the City's planning commission demonstrate that the concern leading up to the adoption of Ordinance 77–31 was elimination and/or avoidance of blighting or deleterious effects caused by adult-oriented businesses. (Planning Comm'n Mins. of 5/23/77 at 1–4, Def.'s App. Vol. III at 002238–41.) In its May 23, 1977 meeting, the Planning Commission discussed the merits and drawbacks of the various approaches to dealing with the negative effects of sexually-oriented and other similar businesses. (*Id.* at 1–2.) In particular, the members of the Planning Commission considered the City of Detroit's approach and its experiences in confronting the same problem. (*Id.* at 2–3 (Mr. Knack stating "[h]e thought that the Detroit approach to be a good balance for the com-

munity, as well as protecting Constitutional rights"; Assistant City Attorney Wendt stating that "the Detroit ordinance was not intended to be moral legislation, but was written to prevent concentration or acceleration of these types of uses in neighborhoods").) Second, the introductory section of Ordinance 77–31 is sufficiently clear to establish its purpose: to address secondary effects caused by concentrations of specific businesses, particularly those engaged in the sale or display of sexually-explicit material. Third, the ordinance the City ultimately adopted is almost identical to the City of Detroit's ordinance upheld by the Supreme Court in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Like the City's ordinance, the ordinance in *American Mini Theatres* prohibited regulated uses from locating within 500 feet of a residential area and within 1,000 feet of any two other regulated uses. *Id.* at 54, 96 S.Ct. at 2444–45. The two ordinances also contain the same introductory sections and the same definitions for "adult book store," "specified sexual activities," and "specified anatomical areas." *Id.* at 53–54 nn. 4–6, 96 S.Ct. at 2444 nn. 4–6. Opinions from urban planners and real estate experts identified adverse effects caused by concentrations of adult motion theaters and adult book stores, including depressed property values, increases in crime, and neighborhood blight. The Supreme Court found that "[t]he record disclosed a factual basis for [Detroit's] conclusion that this kind of restriction will have the desired effect." *Id.* at 71, 96 S.Ct. at 2452–53.

■ The record adequately demonstrates that in adopting Ordinance 77–31, the City was relying primarily on the experience, conclusions, evidence, and rationale of Detroit. As set forth in *Renton*, the City was not required to conduct its own studies or to produce evidence showing

that the Grand Rapids was experiencing the same problems as Detroit. *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931–32; *accord Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 240 F.3d 553, 566 (6th Cir.2001)(stating that "a city may use evidence from the experiences of other cities that are similarly situated to establish a reasonable ground to believe that an anticipated harm is real"), *rev'd on other grounds*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). Finally, since Ordinance 77–31 is virtually identical to the Detroit ordinance at issue in *American Mini Theatres* and is intended to accomplish the same purpose, this Court is bound to adhere to the specific result reached by the Supreme Court in *American Mini Theatres* regarding the factual basis for the ordinance. *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6t Cir.1994).

■ With regard to Ordinance 01–07, which amended the definition of "adult book store" under Article 25 to include other types of media, including film, video tapes, video discs, etc., the Court concludes that there was an adequate factual basis for the expansion. A city is not required to conduct new studies or produce new evidence whenever it amends a zoning ordinance. *Renton*, 475 U.S. at 51, 106 S.Ct. at 931. A city may rely on and draw reasonable conclusions from other evidence, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51–52, 106 S.Ct. at 931. The items covered by the expanded definition differ only in form from books and magazines, and it was reasonable for the City to infer that they would produce the same type of secondary effects. *See Pap's A.M.*, 529 U.S. at 296–97, 120 S.Ct. at 1395 ("Because the nude dancing at Kandyland is of the same character as the adult enter-

tainment at issue in Renton, *Young* ... and *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects.").

### b. Narrow Tailoring

Executive Arts contends that Ordinance 77–31 is not narrowly tailored because the definition of "adult book store" encompasses businesses whose principal activity is not the sale of adult material but offer only a small amount of sexually-explicit materials for sale. This argument focuses on the dual standards or "triggers" for a business to be covered as an adult book store which now exist as a result of the state court's interpretation of the ordinance. The first standard covers a business having a "substantial" amount of its stock in trade in sexually explicit materials, which the City has defined in the past as constituting more than 5% of its displayed merchandise. The second standard covers any business having a "section or segment" of sexually explicit materials for sale, regardless of size. Executive Arts points out that this standard would cover many types of businesses not typically considered as offering adult fare, such as a video store with a single shelf of sexually-explicit videos, a book store such as Schuler's Bookstore which has art books depicting the human anatomy, or a party/convenience store with a small section of sexually-explicit magazines. Executive Arts points out that whatever studies may exist, no study supports the conclusion that a business having as little as 5% of its floor space or a small section of its stock devoted to the sale of sexually-explicit material causes any secondary effects.

■ The Supreme Court has stated:

[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but [ ] it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Ward v. Rock Against Racism*, 491 U.S. 781, 798–99, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989)(footnote omitted)(quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). A regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," but a regulation will not be invalidated simply because a court believes that the same result could be achieved "by some less-speech-restrictive alternative." *Id.* at 799–800, 109 S.Ct. at 2758. Moreover, when the speech at issue is "sexually-oriented expression, that enjoys less than the full First Amendment protection afforded to political debate, the cloth need not be cut quite so close." *Mitchell v. Comm'n on Adult Entm't Establishments*, 10 F.3d 123, 137 (3d Cir.1993)(citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991)(Souter, J., concurring)). In addition, in determining whether a city's efforts to regulate and address secondary effects of sexually-oriented adult businesses are sufficiently tailored to withstand constitutional challenge, courts must bear in mind that under *Renton* cities have "broad discretion to choose the means and scope of [their] regulation of sexually oriented businesses." *Z.J. Gifts D–2, L.L.C. v. City of Aurora*, 136 F.3d 683, 689 (10th Cir.1998).

As noted above, in arguing that Ordinances 77–31 and 01–07 are not narrowly

tailored, Executive Arts relies on the fact that there is no existing study showing that a store having 5% (or 3%) of its stock in trade in sexually-explicit material causes secondary effects. Executive Arts relies upon *Wolff v. City of Monticello,* 803 F.Supp. 1568 (D.Minn.1992), and *World Wide Video, Inc. v. City of Tukwila,* 117 Wash.2d 382, 816 P.2d 18 (1991), as support for its position that the City must have some evidentiary basis for using a rule that considers a book store with as little as 5% sexually-explicit material as causing secondary effects. In *World Wide Video,* the Washington Supreme Court held that an ordinance which defined an adult store as an establishment having ten percent or more of its stock in trade consisting of sexually-explicit materials did not serve a legitimate government interest because there was no evidence that a business whose stock was limited to ten and one-half percent sexually-explicit material caused the same type of adverse secondary effects as a business having one hundred percent sexually-explicit material. *Id.* at 389, 816 P.2d 18. In *Wolff,* the plaintiffs, owners of video stores which offered both general release videotapes and adult-only videotapes, challenged a zoning ordinance which designated adult uses as either "adult use/principal" or "adult use/accessory." Because less than ten percent of the floor space of the plaintiffs' was devoted to adult movies, the plaintiffs' video stores fell into the "adult use/accessory" category. The court concluded that the defendant failed to show that the ordinance was narrowly tailored to regulate only those businesses shown to cause unwanted secondary effects because there was no evidence supporting the conclusion that businesses such as those operated by the plaintiffs, which deal with adult material only on a limited basis, cause the same effects as businesses engaged exclusively or predominately in the sale or rental of adult-oriented materials. *Wolff,* 803 F.Supp. at 1573. *See also Wil-Kar, Inc. v. Village of Germantown,* 153 F.Supp.2d 982, 993–94 (E.D.Wis.2001)(concluding that an ordinance which applied to all businesses dealing in any amount of sexually-explicit materials was overbroad because there was no evidence showing that video stores engaged primarily in renting general audience videos but carrying a small percentage of adult material caused adverse secondary effects and the ordinance was not susceptible to a narrowing construction); *Faraone v. City of East Providence,* 935 F.Supp. 82, 88 (D.R.I.1996)(holding that the defendant city failed to justify an ordinance banning sales of adult materials on Sundays and holidays and failed to show that the ordinance applied to the plaintiff's business, which had less than less than ten percent of its stock in adult videos, where there was no evidence of secondary effects arising from Sunday or holiday sales or evidence showing that a business with a small percentage of adult materials caused the same secondary effects attributable to businesses dealing primarily in adult fare).

Other courts have refused to require a precise fit between the evidence relied upon and the specific characteristics of the businesses falling within the scope of the ordinance, so long as the ordinance is aimed at a particular category of businesses shown to cause unwanted secondary effects. For example, in *Mitchell v. Commission on Adult Entertainment Establishments,* 10 F.3d 123 (3d Cir.1993), the plaintiff argued that a state rule regulating the hours of operation for adult entertainment businesses was not narrowly tailored because the effects the regulation was intended to address were not present at the plaintiff's business due to its location. The court rejected the argument, stating:

[Plaintiff's] argument confuses the requirement that judicial resolution of individual disputes must be based on evidence material to the situation of the parties to the case with the requirement that a legislature seeking to restrict the time, manner or means of speech or expressive activity must show that it had a proper purpose.

*Renton* indicates that a state legislature considering an ordinance or a statute designed to regulate the incidental undesirable effects of marginally protected expressive activity does not need to survey every adult book store in the state to determine the effect the statute or regulation will have on each. We think *Renton* leaves a legislative body free to classify and draw lines, provided it does not wholly or practically prevent access to the expressive material whose sale and distribution the ordinance or statute incidentally regulates.

*Id.* at 138 (citation and footnote omitted). Similarly, in *ILQ Investments, Inc. v. City of Rochester,* 25 F.3d 1413 (8th Cir.1994), the Eighth Circuit rejected the argument that the defendant city unreasonably relied upon studies documenting adverse secondary effects of adult businesses because the studies did not address businesses similar to that of the plaintiff. The plaintiff operated a book and video store, with forty percent of its floor space consisting of sexually-explicit books, magazines, and other items segregated into a separate adults-only area. In support of its motion for preliminary injunction, the plaintiff argued, and the district court found, that the studies the city relied on in adopting the ordinance supported neither the breadth of the ordinance nor its application to the plaintiff's particular situation because they did not address adult bookstores offering both sexually-explicit and non-sexually-explicit materials and which allow only off-premises consumption of those materials. *Id.* at 1417. The Eighth Circuit rejected this argument because the studies "identified and measured adverse secondary effects linked to adult businesses generally—higher crime, neighborhood deterioration, lower property values, and an increase in transients—as well as adverse secondary effects *specifically attributable to adult bookstores.*" *Id.* at 1417–18. The city relied on a study by Indianapolis, which included a national survey of real estate appraisers, and a study by St. Paul, which included "one neighborhood in which 20% of the City's adult entertainment establishments, including the only adult bookstore, were located." *Id.* at 1418. The Eighth Circuit stated that under *Renton,* the city was not required to prove that the plaintiff's business "would likely have the same adverse effects on its surroundings as the adult businesses included in the studies by Indianapolis [and] St. Paul." *Id.* Instead, the court observed, if the ordinance was intended to affect "only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects, [the city] 'must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" *Id.* (quoting *Am. Mini Theatres,* 427 U.S. at 71, 96 S.Ct. at 2453 (plurality opinion)). The Eighth Circuit also rejected a similar argument in a more recent case, *BZAPS, Inc. v. City of Mankato,* 268 F.3d 603 (8th Cir.2001). The plaintiff in *BZAPS* operated a bar which did not regularly feature adult entertainment. After contracting with a male dance revue for a one-night performance, the plaintiff learned from the city planning director that such a performance would constitute an adult use allowed only in a zoning area in which the plaintiff's bar was not located. The plaintiff argued that even if the evidence relied on by the city was sufficient to justify the

zoning ordinance on its face, it was insufficient to justify application of the ordinance to the plaintiff's situation because the studies failed to show any link between a one-night performance and the secondary effects the ordinance was intended to curb. The court rejected the argument, stating:

> Once a city has decided to regulate adult entertainment to prevent its secondary effects, however, the city is not required to prove that a particular adult use creates secondary effects before regulating that use, so long as the city reasonably believes that the use is related to other uses that have been shown to cause secondary effects. BZAPS's proposed use differs little from many other adult performances. The fact that this performance is to last for only one night as opposed to what occurs in a so-called "strip club" that features an identical performance on a nightly basis does not preclude the city from reasonably believing that the uses are related.

*Id.* at 606–07 (citation omitted). *See also Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County,* 184 F. Supp.2d 445, 452–53 (D.Md.2002)(rejecting the plaintiff's argument that the studies cited by the county to justify its ordinance did not justify a 10% floor space limit and stating that "Bigg Wolf has provided no evidence tending to show that a store with more than 10% of its floor space devoted to adult material could not reasonably be believed to cause some of the negative secondary effects set forth in the studies and commonly associated with a variety of adult entertainment businesses").

■ The Court need not decide whether the City must cite evidence showing that Executive Arts, with only 3% of its floor space devoted to sexually-explicit books and magazines, is the type of business shown to cause negative secondary effects in order to demonstrate that the ordinances are narrowly tailored. Even if such evidence existed, Ordinances 77–31 and 01–07 would not be narrowly tailored as applied to Executive Arts. The Court reaches this conclusion because a consequence of the state court's interpretation of the ordinances, which is straightforward and literal, is that any mainstream bookstore, newstand, or supermarket having a "segment or section" of sexually-explicit magazines as part of its stock in trade is brought within the scope of the ordinances. The state court held:

> In sum, the segment or section of an establishment which brings it within the code's definition of "adult book store" need not be substantial or significant in relation to the rest of the store. The existence of a segment or section is enough to qualify the establishment in which it is situated as an adult book store subject to regulation.

> Without question, the Velvet Touch contains a segment or section devoted to sexually explicit books, magazines, or other periodicals. Both the words "section" and "segment" describe a distinct part of a whole.

*Vredevoogd v. Executive Arts Studio, Inc.,* No. 01–00039–CZ, slip op. at 7 (Mich.Cir. Ct. Feb. 22, 2001). For example, Executive Arts has presented evidence that non-adult businesses such as Schuler Books & Music, Barnes & Noble, and Walden Books, have a "section or segment" of sexually-explicit materials, making them adult bookstores under the state court's interpretation. (McLaughlin Aff. ¶ 58, Pl.'s Mot. Summ. J. Ex. A.) The inclusion of such businesses is an unintended consequence because, unlike adult-oriented businesses such as the Velvet Touch, there can be no serious argument that those non-adult businesses are the types of businesses that have been shown to cause the deleterious effects which the ordinances

are designed to eliminate. In other words, the City would be hard-pressed to cite any evidence showing that a Schuler Books, Barnes & Noble, and Walden Books located in close proximity to each other would contribute to an increase in crime in the neighborhood or a decline in property values. Yet, any of those stores carrying as few as two or three sexually-explicit magazines, e.g., Playboy or Penthouse, grouped together would fall under the state court's definition of an adult bookstore. It is not the inclusion per se of such businesses within the scope of the ordinances that renders the ordinances not narrowly tailored as applied to Executive Arts; rather, that result occurs because the locational restrictions of the ordinances must be applied to those businesses, further reducing the number of sites available for adult-oriented businesses such as Executive Arts. Executive Arts is thus directly affected by the overbreadth of the ordinances.[8]

### c. Alternative Avenues of Communication

 Executive Arts also contends that Ordinance 77–31 is invalid because it unreasonably limits alternative channels of communication within Grand Rapids. Under *Renton*, a zoning ordinance will be held to violate the First Amendment if it does not "allow[ ] for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50, 106 S.Ct. at 930. However, adult entertainment businesses are not entitled to special treatment or consideration, but "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees." *Id.* at 54, 106 S.Ct. at 932.[9]

 Whether an ordinance leaves open adequate alternative channels of com-

8. The Court understands Executive Arts' challenge to be an "as applied challenge" and not a "facial challenge." (1st Am. Compl. ¶ 29 & Count I Prayer ¶ A; ¶ 39 & Count II Prayer ¶ A.) In an "as applied" challenge, the plaintiff contends that application of an ordinance or statute as applied to the plaintiff's circumstances is or will be unconstitutional. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 240 F.3d 553, 562 (6th Cir.2001), *rev'd on other grounds*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). In a facial challenge, a plaintiff argues that the particular law at issue is unconstitutional as applied to third parties whose expression might be burdened by the law due to its overbreadth and vagueness. *Id.* at 563. While Executive Arts eludes to applications involving other parties, it does not expressly raise a facial challenge and confines its argument to its own circumstances. Therefore, the Court will limit its analysis to an "as applied" challenge.

9. Executive Arts argues consistently in its briefing that the ordinances effectively preclude it from competing on equal footing with non-adult bookstores, which may be located on any of 3,854 parcels within the City versus the seven or so parcels available to adult

bookstores. This Court does not interpret the Supreme Court's reference to "equal footing" in *Renton* in the same manner as Executive Arts, i.e., that adult bookstores must have access to the same number of parcels as non-adult bookstores in order to satisfy the requirements of the First Amendment. Rather, this Court understands the Supreme Court's statement in *Renton* to mean that while a municipality's ordinance may limit or reduce the number of parcels available for adult entertainment businesses without offending the Constitution (so long as the number of sites is not so small as to effectively deny a prospective business owner a reasonable opportunity to open and operate an adult entertainment business within the municipality), market forces and economics must be the only factors affecting the availability of the remaining sites for adult businesses. As the Seventh Circuit has said: "The constitution does not mandate that any minimum percentage of land be made available for certain types of speech. What it does require is that zoning schemes that regulate the location of speech provide a 'reasonable opportunity' to disseminate the speech at issue." *N. Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir.1996)(citing *Renton* ).

munication is an issue that must be decided on its specific facts. *Christy v. City of Ann Arbor,* 824 F.2d 489, 491 (6th Cir. 1987). In considering whether sufficient channels of communication remain open, a court should not consider whether a particular site is suitable for an adult entertain business, but instead should consider whether the site is available for some commercial enterprise. *See Renton,* 475 U.S. at 53–54, 106 S.Ct. at 932; *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1531 (9th Cir.1993). In *Woodall v. City of El Paso,* 49 F.3d 1120 (5th Cir.1995), the court stated:

> [T]he fact that a site may not be commercially desirable does not render it unavailable. It is not relevant that a relocation site will result in lost profits, higher overhead costs, or even prove commercially unfeasible for an adult business. There is no requirement that an adult business be able to obtain existing commercial sites at low cost and with market access to ensure its prosperity.

*Id.* at 1124 (citations omitted). Thus, if a particular site does not possess insurmountable obstacles to development and is "part of the actual real estate market," *801 Conklin Street Ltd. v. Town of Babylon,* 38 F.Supp.2d 228, 241 (E.D.N.Y.1999), it may be considered as providing a suitable location.

To this Court's knowledge, the Sixth Circuit has not identified a minimum percentage of acreage or sites that must be available to provide sufficient channels of communication. One court has observed that "[c]ourts have generally found the number to be inadequate if fewer than a dozen sites, or under 1% of the city acreage, is potentially available." *Dia v. City of Toledo,* 937 F.Supp. 673, 678 (N.D.Ohio 1996). Without setting a specific number of sites or acres, the Eleventh Circuit has

held that the following factors may be considered: (1) size of population; (2) geographical size; (3) number of acres available to adult uses as a percentage of geographic size; (4) the location of the sites within the municipality; (5) the number of adult entertainment establishments currently in existence; and (6) the number of adult entertainment establishments wishing to operate within the municipality. *Boss Capital, Inc. v. City of Casselberry,* 187 F.3d 1251, 1254 (11th Cir.1999). The Ninth Circuit has adopted a similar approach. *See Young v. City of Simi Valley,* 216 F.3d 807, 822 (9th Cir.2000)(stating that in addition to supply and demand, a court should consider other factors such as percentage of available acreage theoretically available to adult businesses; the number of sites potentially available in relation to the population; community needs; the incidence of adult businesses in comparable communities, and the goals of the city plan)(quoting *Int'l Food and Beverage Sys. v. City of Fort Lauderdale,* 794 F.2d 1520, 1526 (11th Cir.1986)).

Both parties have submitted evidence regarding the number of sites available to adult businesses within the City. Executive Arts relies upon the affidavit of its expert witness, R. Bruce McLaughlin ("McLaughlin"), a land use planning consultant. McLaughlin states that: (1) under the City's Zoning Ordinance, an adult bookstore may locate in the C1, C2, C4, PSC (Planned Shopping Center), and UBD (Urban Business District) Zoning Districts, (McLaughlin Aff. ¶ 27); (2) there are approximately 3,854 parcels in the City, consisting of approximately 1,900 acres, available for commercial development, (*id.* ¶ 26); (3) without considering the locational restrictions imposed by the Zoning Ordinance, there are approximately 2,546 parcels in the City, consisting of 1,272 acres, on which an adult book store could be located, (*id.* ¶ 27); (4) the area of the City

is 44.9 square miles, or 28,736 acres, (*id.* ¶ 37); and (5) the 2000 census population of the City was 197,800, (*id.* ¶ 36). Based upon his review of City and County maps, McLaughlin determined that adult uses could locate on approximately 14 to 17 sites, depending on the location of the first use in several areas, and without considering the like-use segregation requirement or the suitability of the individual locations. (*Id.* ¶ 54.) Applying the locational restrictions (500 feet from a residential zoning district and not within 1,000 feet of two other regulated uses) to the identified sites, McLaughlin concludes that there are only six sites on fourteen parcels within the City available for adult uses. (*Id.* ¶ 57.) However, McLaughlin states that he has identified approximately twelve existing businesses, including party stores and general release bookstores, and possibly others, which would be required to relocate to one of the six identified sites under the state court's interpretation of Ordinance 77–31. (*Id.* ¶¶ 58, 61.) The six identified sites equate to one site for every 32,967 persons. (*Id.* ¶ 63.) The fourteen parcels represent 0.36% of the total commercial parcels in the City and .55% of the parcels in the zoning districts in which adult uses are permitted. (*Id.* ¶ 65.) The approximate acreage of those parcels is 16.7 acres, which represents 1.33% of the total area of the zoning districts in which adult uses are permitted, 0.06% of the total acreage in the City, and 0.88% of the total commercial area of the City. (*Id.* ¶¶ 66–67.)

The City submits an affidavit from William Hoyt ("Hoyt"), its Planning Director, to rebut McLaughlin's affidavit. Hoyt states that adult uses are permitted in C1, C2, C4, PSC, UBD, and TBD (Traditional Business District) Districts. (Hoyt Aff. ¶ 6, Def.'s App. Vol. III at 002193–96.) Hoyt states that he has identified 2,520 parcels on which adult bookstores are permitted uses. (*Id.* ¶ 7 & Ex. A.) Of those

parcels, Hoyt has identified 79 which are located in zoning districts permitting adult uses and are more than 500 feet from a residential district. (*Id.* ¶ 9.) After causing the 79 parcels to be located and measured for proximity to two other regulated uses within 1,000 feet, Hoyt has determined that there are fifteen parcels, consisting of four non-conforming but grandfathered locations which would permit an adult bookstore and eleven other sites within the City which would permit an adult bookstore without the need to request a waiver/variance from the locational requirements. (*Id.* ¶¶ 12–15.)

The City contends that McLaughlin's conclusions should be rejected because he relies upon erroneous legal standards in determining the number of sites available for adult uses and the sufficiency of that number to meet the constitutional requirement for alternative channels of communication. First, the City argues that McLaughlin improperly determined that several "mainstream" businesses such as Barnes & Nobel and Schuler Books now qualify as adult bookstores under the state court's interpretation of the Ordinance because the City has not determined that such businesses constitute adult bookstores under the Zoning Ordinance. The City further argues that in contrast to Executive Arts' situation, there is no judgment from the state court determining that the businesses identified by McLaughlin are not nonconforming uses. Second, the City contends that McLaughlin improperly excluded legally available sites located in PSC (Planned Shopping Center) Districts on the basis that there would likely be impediments, i.e., restrictions and covenants, which would preclude adult establishments in shopping centers. Third, the City argues that in his analysis, McLaughlin took into consideration "permanent occupancies not likely to relocate"

and the presence of deed restrictions or other legal impediments to the operation of an adult bookstore.

The Court rejects the City's argument that McLaughlin improperly determined that mainstream bookstores such as Barnes & Noble and Schuler Books constitute adult bookstores. The City does not assert that such stores do not have sections or segments of sexually-explicit material which would be sufficient to bring them within the definition of an adult bookstore under the Zoning Ordinance. Instead, the City merely asserts that *it* has not interpreted that such stores are not regulated uses. (Hoyt Aff. ¶¶ 17–18.) As Executive Arts has learned first-hand, the City's interpretation is not always correct. In reaching his conclusion that Barnes & Noble and Schuler Books fall within the definition of an "adult book store," McLaughlin was simply applying the state court's interpretation of § 5.284(2) in a straightforward manner. Other than its own subjective opinion, the City has not cited any persuasive reason why such establishments would not be classified as adult bookstores under the ordinance. The Court does agree, however, with the City that McLaughlin's conclusion that other businesses constituting regulated uses under the state court's interpretation will be forced to locate, thus further depleting the number of sites available for adult uses. Nothing in the record shows that any of the identified businesses would be required to locate and there has been no determination that those businesses are not nonconforming uses. Thus, McLaughlin's conclusion is based upon conjecture and supposition about future events without any showing of a real possibility that they will occur.

The Court also agrees with the City that McLaughlin's conclusions should be reject-ed to the extent that he considered the presence of deed restrictions or covenants and "permanent occupancies not likely to relocate" in his analysis, because such considerations are irrelevant to the First Amendment inquiry. *David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1335 (11th Cir.2000); *accord Bigg Wolf Discount Video*, 184 F.Supp.2d at 455. This point is not crucial to the Court's inquiry, however, because McLaughlin confirms in his second affidavit that he did not consider those factors in his analysis. (2d McLaughlin Aff. ¶ 8, Pl.'s Reply Br. Ex. D.) In other words, in determining the number of sites available for adult uses within the City, McLaughlin followed a restrictive approach and applied only the locational requirements of the ordinance and the state court's interpretation of the definition of adult bookstore, where applicable. (*Id.* ¶¶ 8–10.)

Executive Arts has identified defects with Hoyt's conclusion that there are fifteen sites available for adult uses, specifically with regard to the eleven non-grandfathered sites he has identified.

First, Executive Arts points out that sites 14–18 and 22 identified by Hoyt as meeting the location requirements are not only within 1,000 feet of each other but are also within 1,000 of another regulated use, the Scoreboard Saloon located at 1233 Plainfield Avenue. (*Id.* ¶¶ 15–17.) Thus, an adult bookstore located on any of those six sites would disqualify the remaining five sites because they would be located within 1,000 feet of two other regulated uses. (*Id.* ¶ 18.) *See Franklin Jefferson Ltd. v. City of Columbus*, 211 F.Supp.2d 954, 959–60 (S.D.Ohio 2002)(taking into consideration the ordinance's one-half mile distance requirements in determining the number of available sites). The City has

failed to refute this evidence.[10]

Second, Executive Arts notes that sites 23, 24, and 25 included within Hoyt's eleven non-grandfathered sites are within 1,000 feet of each other. (*Id.* ¶ 21.) Therefore, if adult bookstores located on two of the sites, the third site would be disqualified because it would be within 1,000 feet of two other regulated uses. (*Id.* ¶ 23.) Again, the City has failed to refute this evidence.

Third, Executive Arts points out that site 44 is disqualified because it is located within 1,000 feet of a bar, which is a regulated use, and Barnes & Noble, a book store with a section devoted to the sale of second-hand books, thus qualifying it as a "secondhand store." (*Id.* ¶¶ 26–29.) The City contends that site 44 is not barred from consideration because the two other uses are located in the City of Kentwood, not Grand Rapids. (Def.'s Supplemental Br. at 6 n. 2.) This statement, however, is both unsupported in the record and contradicts the testimony of a zoning staff member that the City considers uses located in adjacent municipalities in applying the locational restrictions of the ordinance. (Thompson Dep. at 134–35.)[11] Citing

*David Vincent, Inc. v. Broward County,* 1998 U.S. Dis. LEXIS 22720 (S.D.Fla. 1998), the City also asserts that site 44 is also available because the City commits that it is legally available and the City will be bound by that commitment in future legal proceedings. The problem with this argument is that it ignores history: such a stipulation is not binding upon a resident of a nearby residential district, such as Vredevoogd, who would have standing to seek enforcement of the Zoning Ordinance.

Finally, Executive Arts contends that site 51 is disqualified because it is within 1,000 feet of two other regulated uses: (1) Schuler Books, which has a section or segment devoted to the sale or display of sexually-explicit books, thus rendering it an "adult book store"; and (2) B & B Party Shoppe, which is a regulated use based upon its sales of packaged beer and wine. (*Id.* ¶¶ 31–33.) Although the City asserts that site 51 is not within 500 feet of residentially-zoned property and not within 1,000 feet of two other regulated uses, it fails to cite any evidence in the record to support this assertion. Thus, when the locational restrictions are fully applied, the eleven sites identified by Hoyt are reduced

---

10. The City has suggested that in determining whether there are a sufficient number of sites to satisfy constitutional requirements, the Court should focus only on how the ordinance impacts Executive Arts rather than upon how it might affect hypothetical adult businesses that may or may not seek to locate within the City in the future. As the Court understands the City's argument, however, an ordinance would be constitutional so long as there is even one possible site available to a prospective adult business. The Court rejects such an approach because it accepts supply as the sole determinative factor to the exclusion of other relevant considerations, such as demand. *See Isbell v. City of San Diego,* 258 F.3d 1108, 1114 (9th Cir.2001)(stating that while supply and demand are important factors, it does not automatically follow that an ordinance is constitutional if demand does not exceed supply).

11. In spite of the testimony from the staff member, the City asserts that there is no justification for such an interpretation in the language of the ordinance. This argument must be rejected because the staff member's interpretation makes perfect sense. The purpose of the ordinance is to separate adult uses in order to eliminate the undesirable effects resulting from concentration of such businesses. It is highly doubtful that persons who frequent adult entertainment businesses and engage in the type of activity at which dispersal ordinances are aimed consciously respect municipal boundaries and limit their activities in one municipality so as to avoid producing negative effects in the other municipality right across the street.

to three, thus yielding a total of seven available sites when combined with the four non-conforming sites.[12]

Based upon the evidence before the Court, there are either six or seven sites available for adult uses within the City, depending upon whether McLaughlin's or Hoyt's analysis is accepted. The Court does not find the difference of one site to be material, however, because if six sites does not provide ample alternative channels, one site will not make a significant difference. As noted above, however, there is no particular test and the Court must consider the particular circumstances, taking into account factors such as those identified in *Boss Capital, Inc., supra.*

One measure is a comparison of the number of sites here to those in other cases. Six or seven sites is less than the dozen which the court in *Dia v. City of Toledo, supra,* thought to be generally inadequate. *See* 937 F.Supp. at 678. It is also less than the eight or nine sites the Michigan Court of Appeals held to be sufficient in *Jott, Inc. v. Charter Township of Clinton,* 224 Mich.App. 513, 569 N.W.2d 841 (1997). *See id.* at 529–30, 569 N.W.2d at 848. The number of sites is more, however, than the two-to-four sites within a half mile strip in the City of Wyoming in *CLR Corp. v. Henline,* 702 F.2d 637 (6th Cir.1983), in which the Sixth Circuit invalidated a Wyoming ordinance containing locational restrictions similar to those involved in this case and in the Detroit ordinance in *American Mini Theatres.*

A more meaningful measure is the relationship between the number of available sites and the size of the population. *BBI Enters., Inc. v. City of Chicago,* 874 F.Supp. 890, 896 (N.D.Ill.1995)(stating that

the relationship between the number of sites available in a city for adult uses and the size of the city's population is more relevant in determining supply and demand). In *Centerfold Club, Inc. v. City of St. Petersburg,* 969 F.Supp. 1288 (M.D.Fla. 1997), the court considered whether nineteen possible sites for adult businesses was sufficient in relation to the population of St. Petersburg, Florida. The court determined that the ratio of one site per 12,565 persons based on a population of 238,726 was inadequate. *Id.* at 1305–06. The court reached its conclusion based upon a comparison of the ratio in that case with the ratios in other Florida cases where the number of sites was found to be adequate. Those ratios ranged from one site per 2,181 persons to one site per 6,761 persons. *Id.; see also Franklin Jefferson Ltd.,* 211 F.Supp.2d at 959–60, (finding one site for every 64,679 people, along with less than 0.05% of total acreage available for adult uses, inadequate for alternative avenues of communication). Using all fifteen of Hoyt's sites, the ratio in this case based upon Grand Rapids' 2000 population of 197,800 is one site per 13,186 persons. Reducing the sites to the actual number available (7) yields one site per 28,257 persons.

An additional measure is how the number of acres available to adult businesses compares to the geographic size of the municipality. *Id.* (noting that courts have invalidated zoning laws restricting adult businesses to less than one percent of a city's total acreage). The evidence before the Court indicates the total acreage of the City (28,736 acres). The record also indicates that approximately 16.7 acres are available for adult businesses, which equates to approximately .88% of the total

---

12. The City has had ample opportunity to request leave to submit supplemental affidavits or evidence to rebut the information in McLaughlin's second affidavit but has failed to do so.

commercial area of the City and approximately .06% of the City's total acreage. In addition, the record shows that there are 3,854 commercial parcels in the City on which a non-adult bookstore could locate but, using Hoyt's number, only 15 parcels on which an adult bookstore can locate, thus leaving less than one-half of one percent of all the commercial property in the City available for adult bookstores.

■ In spite of the ratios cited above which tend to show that Ordinances 77–31 and 01–07 do not allow for reasonable alternative avenues of communication, the City contends that 6 or 7 sites is sufficient because there is no evidence that demand for sexually-oriented businesses exceeds the supply of available sites. By the same token, there is no evidence in that this is not the case. In other words, the City has not produced any evidence regarding demand for such businesses within the City. See N. Ave. Novelties, Inc., 88 F.3d at 445 (noting that the Chicago Zoning Administrator testified that his office received only 4 or 5 inquiries per year concerning possible adult use locations). More importantly, the Court still might conclude the number of sites (6 or 7) to be adequate if the uses regulated by Article 25 of the Zoning Ordinance were limited solely to adult bookstores or adult uses. That, however, is not the ordinance at issue. Article 25 of the Zoning Ordinance casts a broad net over various unrelated businesses, rendering them subject to the same locational restrictions as adult uses. For example, Executive Arts must compete not only with mainstream bookstores having "a segment or section devoted to the sale or display of" certain specified sexual content but also with adult theaters and cabarets, amusement establishments (such as video arcades), pawnshops, secondhand stores, pool and billiard halls, convenience stores, public lodging, and motorcycle clubs for a

limited amount of real estate. In light of the scope of the ordinances as well as the inadequacy of the number of sites, the Court concludes that Ordinances 77–31 and 07–31 are unconstitutional because they do not allow for adequate alternative channels of communication as required under *Renton.* Therefore, the Court will grant Executive Arts summary judgment on Counts I and II of its First Amended Complaint.

### *Conclusion*

For the foregoing reasons, the Court will deny the City's motion to dismiss and grant Executive Arts' motion for summary judgment on Counts I and II. In addition, the Court will dismiss Counts III and IV of the First Amended Complaint pursuant to Executive Arts' stipulation that the Court need not reach those issues in the event it grants Executive Arts' motion for summary judgment on the alternative channels basis. (Pl.'s Supplemental Br. at 10.)